Good morning, Your Honors. I hope you all had a nice weekend. Good morning to you. I'd like to reserve two minutes, please, if that's possible. Yes, please watch your clock. Thank you, Judge. May it please the Court, David Hagighi on behalf of the petitioner and Ms. Leli Tan. Our first contention is that substantial evidence does not support the Board's adverse credibility finding. In fact, the government concedes that the Board applied the wrong legal standard. As to the credibility decision. So the question is how can the Board's application of the wrong legal standard regarding credibility, which is perhaps the single most important question in any asylum case be harmless error? The answer is it can't. So the case should be remanded back to the Board, allow the Board to correct its mistake, and if they don't find her credible, then we'll be back again under the process. Well, let's assume that she's credible with regard to each incident of persecution that she suffered. Is the record enough to compel the finding that she suffered past persecution? Yes, Your Honor. So that was their alternate holding. So the Board said the Board was compelled to take each and every incident of harm that she described as being credible. And what did she testify to? In addition to the normal discrimination and robberies against the ethnically Chinese, she said that during the May 1998 riots, her husband was beaten while trying to protect her. She was forced to flee her home in a separate incident when she was in a taxi cab with a 13-year-old daughter. Three men with knives came into that cab. They sexually assaulted her, and I'm not going to downplay it and use the words that the Board used or the government is advancing inappropriately touching. They grabbed at her chest, they grabbed at her legs, and they said, quote, unquote, your Chinese skin is so fair, I want to rape you. That's at the administrative record, page 381. Then the last thing that she testified to is that her father was threatened at gunpoint and his restaurant was burned down. So Judge Nguyen, yes, we do. We submit that the harm she endured constitute persecution on account of a protected ground. Now, counsel, I imagine when the government gets a chance to speak, they're going to say, well, if she was so concerned about going back to her country or being forced to go back, why did she go back three times? So if you could address that. Of course. And they're going to advance the Lojo case, and this is very different than the Lojo case. The facts are distinguishable. Lojo came to the United States one time. There was an issue with work, and then, you know, she went back and then came back. This is different. On each time that she went back to Indonesia, there was a necessity to go. There was one time where she had to return because her father sustained injuries in a bus robbery. Another time was her mother and her daughters were traumatized because the daughters on the way to school, there was an incident. And after the last incident that happened at her father's restaurant where it was burned down, that's when she realized, hey, I can't stay here anymore. How long did she stay for each visit? Does the record show? I think it does. I don't know it offhand. I can take a look really fast and then come back. I think she was here for, I think on one of them was a few weeks, on one of them was a little bit longer than that, a few months. But still, it was a necessity to return rather than just coming for a pure visit and then going back to her country. And I take it your position is that we can't fully assess whether all of that is credible at this point because down in the immigration courts they applied the wrong standards. So we need to, to whether we can really assess whether those happened in the length of time that they occurred, they're based on her testimony, but to really answer that question, it needs to be sent back to be evaluated under the proper standard. That's correct, because there's a cloud here. Because we're saying, okay, there's an alternate ruling, and, yes, she may or may not be credible. But, no, if we are going to go with the alternate ruling, then you've got to credit her 100 percent. And we're compelled to find that these things each occurred on account of a protected ground. So your argument is really that the adverse credibility finding, which can't stand, tainted the rest of the analysis. I think so, because that's how it seems like that's how they're disposing it. Well, she's adverse credible, but even if we assume that she was credible, it's not going to make any difference. We're going to find, we're going to dispose of this case. That's what it sounds like when you're reading that BIA decision. Now, assuming, assuming that even if she can't show past persecution, then, which, again, I don't know how that is, but she still has a well-founded fear of future persecution. What's the evidence of that? Of what? The well-founded fear of future persecution. Okay. So she's a member of a disfavored group. And this is where the IJs and the BIA is applying, again, the standard incorrectly. They're requiring the applicants to show how they are more at risk than other members within the same group. And, you know, the government argues this in their brief on page 19. They say, quote, unquote, rather, and this is in the second full paragraph, rather, Tan's past experiences of harm and fear of future harm is indistinguishable from what could happen to any other ethnic Chinese Indonesian. So to suggest that violence against her is less on account of because others in the same group are also being targeted is simply illogical. So the question is whether she is singled out from the general population, not from other Chinese, otherwise it turns the rule on its head. And we see that on the cross-examination of Dr. Winters on page 275, where the attorney at the court level said, okay, and is there anything about the respondent in particular that you think makes her more vulnerable than any other Chinese Buddhists? So, again, they're trying to differentiate against people within the same group, and that's not what the rule is. So what does individualized risk of harm mean? Okay, so you have this disfavored group, and you're assessing the member's individual risk as opposed to the general population. Otherwise, here's what I would have to do. If all three of you are ethnically Chinese, how do I distinguish between you? Do I say that you look perhaps more ethnically Chinese than her or than him? Do I say that you're taller and therefore you stand out? Do I say perhaps you're shorter and therefore you stand out? How do I do that? All right, thank you. You see what I'm saying? Thank you, counsel. You've got two minutes now. Thank you, Judge. May it please the Court. I am Jeffrey Hall on behalf of the Attorney General. This case primarily concerns whether two robberies of a Chinese-Indonesian woman over the course of six years compels the granting of asylum. Petitioner was caught in the riots in Indonesia in 1998, yet uninjured and less threatened than many Chinese-Indonesians. In the six years following, the only harm to befall her was that she was robbed and assaulted in a taxi. And raped. Your Honor, the record does not compel the determination that she was raped. I would absolutely characterize it as potentially sexual battery under certain laws. At common law, it wouldn't satisfy the elements of rape. What about the threat of rape? Your Honor, the way the record reads is that the attackers suggested that they would like to rape her, but immediately left and fled the scene. That's not enough to constitute a threat? Your Honor, the attackers did not specifically indicate that they were going to do so, and they didn't attempt to do so. There's nothing on the record compelling the conclusion that they attempted. Harvey Weinstein might need you to defend him. Sorry. No, Your Honor. Your Honor, she was certainly what, again, would be considered potentially sexual battery under many states' laws, and it's odious. Okay, but you're saying one instance of this happening does not constitute persecution is what your argument is? Yes, Your Honor. Okay. It seems, Counsel, that the record in this case is somewhat of a mess, though, because everyone agrees that the wrong standard was applied on credibility. Why not just get it right and just send it back down and apply the right standard, and it might be the same result and the case is over, or maybe there's relief granted, but why not just do that in this case? Your Honor, the BIA and the IJ both went to great lengths to create an alternative holding, and under this Court's precedence, if there is an adequate alternative basis for affirming the BIA's determination, then this Court can do so. The adverse credibility determination was separated from the rest of the analysis, and in that separate analysis, the IJ and then the BIA took everything that the petitioner said is credible, and so it already went through the work of establishing all of that. There is simply no need to send it back and redo it. It just seems difficult to me, though, to say, I think this person is a liar, but now I'm going to act as if they're not a liar and evaluate their claims through that lens. It just seems that's a difficult standard. I'm sure you've got authorities saying that the BIA's done this in the past and that's okay? Yes, Your Honor. So what do we do? I want to explore with you this question of the individualized risk of harm. Yes, Your Honor. What exactly does the government think that means? Your Honor, in Sale, a case involving another Chinese-Indonesian which was on appeal for a very similar situation of asylum and withholding, this court articulated the standard as that a petitioner must be a member of a disfavored group, and then that has to be coupled with the showing that the petitioner in particular is likely to be targeted as a member of that group. The court has, in other places, said that these two elements operate in tandem, so there has to be a general disfavor of the population, but that sort of raises the probability that any particular individual in that group may be targeted, but then you have to show individual targeting of that person as a member of that group, so not merely out of the general population but out of that group. So what Sale said was that because the record establishes that ethnic Chinese are significantly disfavored in Indonesia, and we have that here, right? The record establishes that or not? This record does not establish that they are severely disfavored. Following the Sale case ---- I think the word is significantly. ----significantly, or significantly. In the Lelong case, the en banc court reviewed the evidence and suggested that the country was making substantial progress in resolving the ethnic tensions that had occurred. What year was that? Sale is 2004. Yes, Your Honor. Well, to get back to it, so the point I'm trying to ---- I mean, I don't know if we've really fleshed out this individualized risk. There's a cite in Sale that says ---- the cite's another case that recognizes that past threats and violence may establish a sufficient individualized risk, even if they did not rise to the level of persecution. So what I'm trying to explore is that in this case, she doesn't have to establish past persecution, but she can establish something less than persecution because she's a member of a disfavored group. Your Honor, she ---- the quantum of evidence required to show that she has a well-founded fear of persecution is the same, but the way in which this analysis operates is that the fact that she's a disfavored group can sort of help her in that analysis. So she has to show less of evidence of an individualized risk out of the members of her group. So I guess what I'm asking is, so what she's shown here may not rise to the level of past persecution, but it could still create an individualized risk under Sale. Your Honor, it's correct that in ---- the court found that there was no past persecution, and I think that case is analogous enough to say that in this case there certainly is no past persecution because she's not actually been injured. And there have been other cases showing that even two armed robberies of an individual, the Gormley case, is not sufficient to establish past persecution. In terms of a well-founded fear of future persecution and individual targeting, Sale and Hoekse and the other cases where it found that there was an individualized threat are significantly distinguishable. So in Sale, the petitioner was called out multiple times by name by attackers. So when she was in the boarding house, people came and vandalized her car, said threats specifically targeted her by her name, and once tried to assault the boarding house and get inside and assault her. Again, saying her name specifically. There was also another incident after the riots in which people within her neighborhood, again, told her that she needed to get out because she was the only Chinese person there. In Hoekse, the petitioner was targeted by government forces for an interview, and those types of interviews were the type that somebody could be brought in and beaten or tortured. So in both of those cases, you have people who know these people, the petitioners, and who are specifically going after them and could do so if they were to return. Counsel, I asked you a question earlier about the authority that says if the IJ or BIA gets the standard of review wrong on credibility, we can still go ahead and reach the merits essentially on a harmless error analysis. Do you have a citation for that? I do, Your Honor. A Bovian V.I.N.S. It says that if there's an error of the BIA's credibility determination, remand of this matter would not be necessary if the BIA established an adequate alternative basis for its decision to deny asylum. And that's a pre-real ID case? Yes, Your Honor. Do you have any post-real ID cases that say that? I would have to shepherdize that, Your Honor, to see. So, Your Honor, I would also like to address the fact that it is quite relevant that the petitioner returned three times to her country. The petitioner has said that LOHO is distinguishable, but LOHO stands for the general proposition that if you return, that undermines both past persecution and a well-founded fear of future persecution. And it's not just adverse credibility determinations in which that happens. It's also on the objective side because it applies to both past persecution and a well-founded fear of future persecution. And it's not merely that she returned. It's also that she testified on her returns that she had no significant fear of returning. Even after the taxi robbery. Do you know how long she was there each time? I believe it was one month, two months, and four months that she was in the United States for the first, second, and third trip in the United States, during which she went sightseeing and stayed at relatives. So I assume that my time has expired. All right. Any other questions, Your Honor? No. Thank you very much, counsel. Thank you. Thank you. Your Honor, it's just a few things. Number one, the government keeps on concentrating on physical injury. In this jurisdiction, it is well-established that emotional suffering and psychological suffering are sufficient rather than having a need or necessity to show physical injury. Number two, the facts in this case greatly outweigh the facts in Sayal. She was physically attacked in a cab. Sayal was never physically attacked. Sayal, again, as he said, they yelled out her name, and she had her car vandalized, and she was in the backseat of a taxi cab during the riots. And then the number three part is the government concentrates on people knowing the name of their would-be persecutor. However, the single out path is not reserved solely for those applicants whose would-be persecutors seek them out personally by name. Rather, COSAX v. INS recognizes that one's chances of being singled out from the general population and subjected to persecution is often strongly correlated with the frequency with which others who share the same favored characteristics are mistreated and persecuted. So there is no element that they have to know who you are. It's just that they have to hate you for the characteristics that you possess here being ethnically Chinese. It has to be coupled with some incidents. Right. Exactly. So the incidents that she suffered through the May 1998 riots, through the taxi cab, through her father's store being burned down, these all show a nexus to these incidents or all indicative of her being singled out in fear of future persecution. All right. Thank you, counsel. I want to thank both counsel for an excellent argument on this tough case. Thank you. Thank you, Your Honor. Thank you. The next case, Alfonso v. Sherman, is submitted on the briefs.
judges: Wardlaw, Nguyen, Owens